WARNER v. STATE.

COMPETENCY OF WITNESSES. . The rule of the common law in criminal cases, respecting the competency of witnesses, has not been changed by the Code; and an infant, under ten years of age, is *admissible* as a witness in a criminal case.

*Appeal from Pulaski Circuit Court.*

Hon. WILLIAM STORY, Circuit Judge.

R. S. GANTT and GEO. E. DODGE, for appellant.

MONTGOMERY, Attorney General, for appellee.

BOWEN, J.

At the May term, A. D., 1869, of the Pulaski circuit court, the appellant, James Warner, was convicted, upon an indictment, for the murder of Johanna Stange, and sentenced to be hung on the 9th day of July, 1869. The bill of exceptions sets out the evidence and the motion for a new trial, and shows the overruling of such motion, and the exceptions taken to the ruling; also, that the prisoner's counsel objected to allowing the witness for the prosecution, Minerva Stange, to testify, on the ground that she was an infant, under the age of ten years, to wit: nine years and eleven months old, and incompetent, as a witness, under the Code; that such objection was, by the court, overruled, and that exceptions to such ruling were duly taken by the prisoner's counsel.

We have, then, for consideration:

1. The admission of the evidence of Minerva Stange, over the objection of the appellant.

2. The overruling of the motion for a new trial, which was made upon the ground that the verdict of the jury was against the law and evidence.

The record shows that the witness, Minerva Stange, was nine years and eleven months old. Under the Code she would not have been a competent witness in a civil cause, but the rule of the common law, in criminal proceedings, in relation to the competency of witnesses, has not been changed by the Code, and the circuit court was correct in overruling the objection and permitting the witness to testify.

The consideration of the action of the circuit court, in overruling the appellant's motion for a new trial, brings up for review the evidence in the case. The instructions of the court not appearing of record, we presume that no objection was made in regard to the law as expounded by the court.

It appears, from the evidence, that the deceased was found dead on the morning of the first day of August, A. D. 1868. Dr. A. K. Hartman's evidence discloses that she had received three blows on the head with a sharp instrument—one in the forehead and one behind each ear—either of which was a mortal wound.

The prisoner was seen, by John Duffe, at Mrs. Stange's, the deceased, about seven o'clock on the evening before the morning on which the deceased's body was found. Mrs. Stange then paid the prisoner about two dollars and forty-five cents, in money, out of a small box resembling a cigar box.

G. Hersch, a soldier, was at Mrs. Stange's house, between eight and nine o'clock, on the evening of the 31st day of July. He started to go away about a quarter before nine; there were several soldiers, Mrs. Stange, and the child, Minerva Stange, in the house at the time. About ten minutes before the witness started away, he was sitting outside the house, and saw the prisoner about forty or fifty yards off, in the bushes; he

saw only his face, and recognized the prisoner as the person he saw there.

Otto Miller, another soldier, was at Mrs. Stange's the same evening, from about seven o'clock until about ten minutes before nine o'clock, and was the last one who left, leaving only Mrs. Stange and the child at the house when he left. As he was leaving, and after he had gone twenty or thirty yards, he heard a noise in the bushes, and, turning around, saw the prisoner come out of the bushes opposite the door, and pass over and enter the house. He had seen the prisoner once before, and recognized him as the person he thus saw. Mrs. Stange's house was south of the arsenal, and it was about three-fourths of a mile from the house to the brick yard. Witness saw Mrs. Stange's dead body the next day, lying about half-way between the house and the brick yard.

James W. Vance, a policeman, arrested the prisoner the next morning, and went with him to his (prisoner's) residence. The prisoner denied having any money, but finally said he had some, and showed witness where it was in a pillow—about twenty-one dollars—but positively denied having any more.

In the mean time a search warrant was brought, and, on proceeding to search the premises, about eighty-three dollars more were found in the prisoner's bed, inside of the mattress, which the prisoner denied knowing anything about. Out of the money found, Gustave Stange, husband of the deceased, identified eight dollars as money which he had handed to his wife a few days previous.

John Agery saw the prisoner enter Bethel church the night of the murder, between nine and ten o'clock; witness left the church a short time before the meeting broke up; prisoner looked wild and scared, and witness remarked at the time that he would bet that Jim (the prisoner) had been stealing something.

Rev. John Peyton, who was conducting the exercises at the church, fixes the time of their close at ten o'clock, and says

29

that the residence of the prisoner was about one hundred yards from the church.

John Thomas, a witness for the defense, left the church with the prisoner a short time before the conclusion of the exercises; when near the prisoner's house, the latter bid him good night, and went toward his residence. Witness did not go to church with the prisoner, nor did he know how long he had been there; did not see him when he entered the church.

John Peyton says: "Services at the church usually commence between seven and eight o'clock—nearer eight than seven.

Thomas, the witness, thought he had himself been at church less than one hour and a half.

There is other evidence in regard to various localities, some immaterial and some corroborative, which we will not specially allude to. The evidence of the child, Minerva Stange, nine years and eleven months old, whose answers show her to be a child of intelligence and truth, corroborated by that of Hersch and Miller, furnishes the solution of the whole matter. From her we learn that, soon after the departure of Hersch and Miller, the prisoner entered the house and told Mrs. Stange that her husband had been sun struck; that he had been bathing his head, but it did no good; that her husband wanted her and the child to come to the brick yard, and to bring the little blue box from behind the counter, but did not say what was in it; that Mrs. Stange started with the prisoner, but told the little girl to remain at home, and that she would send her brother and the black woman to stay with her. Neither of them, however, came, and the child remained alone all night; that soon after her mother and the prisoner started she heard the drums at the arsenal.

We have carefully examined all the evidence, and considered the facts and circumstances therefrom appearing.

The prisoner left his home about seven o'clock, or soon after the cannon fired at the arsenal, on the night of the murder; was seen by two witnesses, a few minutes before nine o'clock, near and at the house of Mrs. Stange. A portion of the

money found at the house was identified by Mr. Stange, the husband of the deceased, as money handed by him to his wife. A few moments after the departure of Miller he was seen by him to enter the house where Mrs. Stange and the child Minerva were, at a time when no other persons were there. He represented that Mr. Stange had been sun struck, and wanted Mrs. Stange and the child Minerva to come to the brick yard and to bring the blue box. Mrs. Stange left the child at the house, and started with the prisoner, a very few minutes before nine o'clock—the time the drums beat at the arsenal. Mrs. Stange was found dead half way from the house to the brick yard; fragments of the blue box were found at the same spot, and only a few dollars in money. Mrs. Stange must have had with her in all one hundred and forty dollars when she started, according to the evidence of Mr. Stange. The prisoner appeared at Bethel church between nine and ten o'clock, a short time before the conclusion of the service, and left again before the congregation separated. His appearance was remarked at the time as wild and scared, and that he looked like he had been stealing something. The services concluded about ten o'clock, and he must have gone immediately and in haste from the scene of the murder to the church. His premeditated plan was, without a doubt, to kill both mother and child, the better to conceal his guilt, and the life of the latter was saved by the mysterious workings of the Providence of Almighty God. First, in suggesting to the mind of the mother to leave the child at the house; and, secondly, in its operation upon the mind of the murderer after the commission of the deed, whose smitten conscience filled him with such a spirit of moral and physical cowardice that he could not return to kill a defenseless child, who, thus preserved, furnished the link which binds together the chain of facts and circumstances which, thus strengthened and connected, drags him with a remorseless power to a doom from which, for him, there is no escape.

The judgment of the circuit court is in all things affirmed.