HUDSON *v.* STATE.

4346                                                     179 S. W. 2d 165

Opinion delivered March 27, 1944.

*A. A. Ross* and *H. W. McMillan,* for appellant.

*Guy E. Williams,* Attorney General, and *Oscar E. Ellis,* Assistant Attorney General, for appellee.

GRIFFIN SMITH, Chief Justice. Walker Hudson, Negro, has appealed from a judgment that he be electrocuted for the murder of his wife, Junie.

In September, 1942, Junie separated from Walker and went to the home of her father, Mark Pheiffer. Two weeks later she was followed by her husband who stayed with her several days. Walker says that during this time he unsuccessfully attempted to reconcile differences. On Monday he left his father-in-law's house, but returned Wednesday. The following morning he asked his wife to sign a waiver of summons in connection with a divorce suit he proposed to file, or had filed. This she refused to do, but indicated she might comply later. Following the conversations relating to the waiver, Junie went half a mile to a store (owned by C. C. Cox) where small purchases were made. She was brought back to her father's house by Cox, who used his truck.

Junie prepared dinner; also a lunch she intended to take to a son who worked at a nearby sorghum mill.

Meanwhile appellant left the Pheiffer home and went to the Cox store, where he purchased some potted meat and other foods. Junie took the prepared lunch and a baby in arms; and, accompanied by a young daughter, Pauline Pheiffer,[1] started to the mill where her son was working, following a path crossed by a fence. When she reached the fence she was encountered by appellant who was apparently waiting for her. Other than appellant, Pauline was the only eye witness to what followed.

Appellant testified that he again asked his wife to sign the waiver. She replied that she could not, the inference being that inability was due to the fact that she was carrying the child. Appellant says that while Junie was standing near the fence she put the lunch "on the other side." Pauline crossed under the wire, and Junie "set the baby down on the inside." Appellant says he stood and talked with Junie, and "handed her that divorce." While she was apparently in the act of signing the waiver, he told her something about "T. Hays," (who is also referred to as T. Young). Junie quit writing, looked at appellant, applied a vile epithet and struck him. Appellant says he threw his hand up and at the same time Junie "hit (indicating) [at my ribs on the left side] and I got my gun and commenced shooting and backed on back like this." Appellant testified Junie cut his clothing and later "had him at the throat." He also testified that while shooting he was continuously backing away. One shot took effect in the upper part of Junie's left arm, another went through her heart, and three entered her head—one through the mouth, one through the nose, and the other through a cheek.

Pauline testified that her mother did not attack appellant or make any demonstration. According to this witness, when "Hays" or "Young" was being discussed appellant told Junie that if he could not get her out of

---

[1] The Walker Hudson family consisted of one child, born as a result of his marriage to Junie, and six children Junie had at the time of their marriage. It is conceded that these children were not Walker's. ["Pauline" is referred to as "Revelena" in a statement signed by appellant.]

the way he would kill her. Following this declaration he began firing.

Appellant immediately went to East St. Louis, where he was apprehended a year later. A statement appellant subscribed soon after being arrested was made a part of the testimony of Sheriff Wells of Clark County. In it the shooting and preliminary activities were described, as shown in the footnote.[2]

Errors argued in appellant's brief are (1) that Pauline, on account of immature age, was incompetent to testify; (2) instructions Nos. 15 and 8 were erroneous; (3) evidence was insufficient.

*First—Competency of Child's Testimony.*—There is substantial evidence that Pauline was more than seven years of age, although this is denied. The common law affecting competency of a witness was not changed by the Civil Code,[3] which provides that "infants under the age of ten years, and over that age if incapable of understanding the obligation of an oath, shall be incompetent to testify in civil cases."

---

[2] "Then came the day when we had the trouble that caused her death. That morning she left the house and went to Cox's store to get something for the house. She came back riding in Mr. Cox's truck, brings the groceries in the house. I get up and walked down to Cox's store and bought me something to eat—cheese and crackers, and a can of tobacco. I started back eating, and she had in the meantime cooked dinner for the boys at the sorghum mill. I met her taking the dinner down to the mill. Before I got to her I saw some man run away from her and I never did know who he was. I walked on and met her. She was carrying the dinner and the baby and Revelena was walking along with her. I talked to her about signing the waiver. She finally agreed to sign it and I gave her a pencil. She put her foot on the fence to sign it and about that time I said something to her about the man she had been with, and when I said that she flew all to pieces and refused to finish signing it. She called me a goddam liar. She had already put the baby down. She grabbed at me and caught me by the shirt collar with her left hand and slashed me with the other. I couldn't tell what it was she cut at me with. She cut my clothes in front but did not get to my skin because I had on a vest and three shirts and a sweat jacket. I kept her off of me with my hands but she would not turn me loose, and had a death hold on me and she was still cutting at me. I kept trying to pull loose but couldn't and I got my hand on my gun and pulled it out and kept backing up and shooting and shot her several times. When she fell I left."

[3] Pope's Digest, § 5156 (C. & M. Digest, § 4146); *Payne* v. *State*, 177 Ark 413, 6 S. W. 2d 832. [Effect of Act 312, § 6, approved March 26, 1941, is to amend § 5156 of Pope's Digest, but the amendment does not affect the subject-matter of the instant appeal.]

Effect of decisions is that if the child-witness, when offered, has capacity to understand the solemnity of an oath and to comprehend the obligation it imposes, and if in the exercise of a sound discretion the trial court determines that at the time the transaction under investigation occurred the proposed witness was able to receive accurate impressions and to retain them to such an extent that when testifying the capacity existed to transmit to fact-finders a reasonable statement of what was seen, felt, or heard,—then, on appeal, the Court's action in holding the witness to be qualified will not be reversed.

An excellent discussion of competency, in circumstances such as we are dealing with, may be found in the opinion of Mr. Justice BREWER, where it is said that the decision of a trial judge in admitting or rejecting testimony of an infant will not be disturbed "unless  .  .  . it is clear that [the ruling] was erroneous." *Wheeler* v. *United States,* 159 U. S. 523, 16 S. Ct. 93, 40 L. Ed. 244.[4]

In *Alford* v. *State,* 182 Ark. 1184, 34 S. W. 2d 224, a ten-year-old girl was permitted to testify, over objections of appellant that she did not understand the nature of an oath. She answered "No" when asked, "Do you know what would become of you if you were to *swear* a lie?" But to the question, "Do you know what would happen to you if you were to *tell* a lie?" she said, "Yes, sir." Mr. Justice BUTLER said in the opinion that it was apparent the witness knew the difference between truth and falsehood, and understood it was her duty to tell the truth.

Mr. Justice HART, speaking for the Court in *Crosby* v. *State,* 93 Ark. 156, 124 S. W. 781, 137 Am. St. Rep. 80, held that examination of the witness was not sufficiently comprehensive. "The child," he said, "must not only have intelligence enough to understand what he is called

---

[4] A quotation from the Wheeler case is copied in *Payne* v. *State,* 177 Ark. 413, 6 S. W. 2d 832. See *Guthrie* v. *State,* 188 Ark. 1081, 70 S. W. 2d 39; *DeVoe* v. *State,* 193 Ark. 3, 97 S. W. 2d 75; *Yother* v. *State,* 167 Ark. 492, 268 S. W. 861; *Penny* v. *State,* 109 Ark. 343, 159 S. W. 1127; *Crosby* v. *State,* 93 Ark. 156, 124 S. W. 781, 137 Am. St. Rep. 80; *Warner* v. *State,* 25 Ark. 447; *Flanagin* v. *State,* 25 Ark. 92; *Alford* v. *State,* 182 Ark. 1184, (not reported) 34 S. W. 2d 224. [These are only a few of the pertinent cases.]

upon to testify about and the capacity to tell what he knows, but he must also have a due sense of the obligation of an oath.''

In the Crosby case a ten-year-old witness said he did not know what it meant to be sworn, but did know he was expected to tell the truth when he held up his hand and took the oath. He didn't know what would be done to him if he did not tell the truth, but knew it would be wrong.

Chief Justice McCulloch, in *Penny* v. *State,* 109 Ark. 343, 159 S. W. 1127, held that the rule laid down in the Crosby case did not apply. Examination of the child (Leslie Penny, 9) is not set out in the opinion. The transcript reveals that Leslie said he attended public school and went to Sunday School. The Bible taught him that those who are not good will be punished. At home and in Sunday School he had learned that one who does not tell the truth will be punished. Question: ''When you were sworn this morning what did the Clerk say to you when you held up your hand?'' The answer was: ''I have forgotten now.'' Q. ''But did you understand by that that you were to tell the truth about what you told?'' A. ''Yes, sir.'' Q. ''Now, if you don't do that, what would happen to you?'' A. ''I don't know.'' Q. ''Do you know that you would be punished if you didn't tell the truth?'' A. ''Yes, sir.''

A fifteen-year-old Negro (*Guthrie* v. *State,* 188 Ark. 1081, 70 S. W. 2d 39) was permitted to testify. On cross-examination touching qualifications, he replied that he did not know what it was to tell the truth, didn't know what an oath was, nor what would happen to him if he testified falsely. On re-examination he said he did understand the nature of an oath.

It is insisted that Pauline was not sworn, or, if the oath were administered, she was not cognizant of it and did not appreciate the obligation imposed.

The bill of exceptions shows affirmatively that Pauline was sworn. It must be conceded that court re-

porters follow a prescribed form, and it is conceivable that the expressions, ". . . after being duly sworn, testified as follows," were written in pursuance of habit, and were not observed by the Judge when he authenticated.

Counsel for appellant cross-examined Pauline in respect of qualification and asked: "Did you hold up your hand today when they called the names of all those folks back in the courtroom?" (2) "Do you know what an oath is?" (3.) "When [the Circuit Clerk] asked you if you agreed to tell the truth, the whole truth, and nothing but the truth, did you know what he was asking?" To each question a negative answer was given. The little girl asserted that she knew the difference between right and wrong, but did not know what happened to one who did wrong; but she knew about God, and if she did wrong she knew He would do something about it. She later said: "He will kill you!" She knew what the truth was, but when asked to define it replied, "I don't know." There was this question: "If you were asked to tell the truth about something, would you know what they wanted you to tell?" Answer: "Tell the truth." [5]

Following this cross examination the Court asked certain questions [shown below],[6] and announced that Pauline was competent. There was no objection to this ruling at the time it was made. Appellant's attorneys

[5] Amplifying this line of examination, the following questions were asked and answers given: "Q. What do you mean by that? A. Tell the truth. Q. Tell the truth? A. Yes, sir. Q. And if you *didn't* tell the truth, what would happen to you? If you are *not* telling *me* the truth about what I am asking you, what is going to happen to you? A. I don't know. . . . Q. As far as you know, there wouldn't anything happen to you if you didn't tell [those men over there] the truth. Is that right? A. Yes, sir."

[6] Question: "Pauline, you say you know the difference between right and wrong? A. Yes, sir. Q. You have been taught that at home, and in Sunday School? A. Yes, sir. Q. Is it right or wrong to tell a story? A. It's right. Q. It is right? A. It's wrong. Q. What happens to you if you tell a story? A. The bad man will get you. Q. Where did you learn that? A. Nowhere. Q. Now, do you know what swearing is? A. No, sir. Q. Would you swear something is so that is not so? A. No, sir. Q. If you were to sit here today in that chair and tell these people a story, or something . . . that wasn't true, what would happen to you? A. The bad man would get me. Q. Would that be right, or wrong, for you to do that? A. It would be wrong."

were permitted to present vital statistics and similar evidence in an endeavor to show that the proposed witness was only five years of age, and was under five when the shooting occurred. The Court then said, "This girl can testify."

If it can be said that the general objection then made related back to the specific contention urged prior to the Court's interrogation of Pauline, and not to the question of age alone, it would be sufficient to present for review the particular issue—that is, that the Court (in the light of answers to its own questions) was not justified in permitting the witness to testify. We prefer to place our decisions on grounds other than failure to make specific objection, although a strict construction would have that result. Hence, effect is given the general purpose relating to the entire investigation as to qualification.

Was Pauline sworn? In oral argument before this Court counsel for appellant conceded there was no express objection to the alleged oversight to which attention is now called. In fact, when Pauline was being questioned to determine her competency the proceeding was as though she, with other witnesses, *had* been sworn. But, it is argued, her own admissions disclose (a) that she did not hold up her hand, (b) that she did not understand what was being done, or (c) if she did take the oath, the act was perfunctory and without conscious obligation.

Wharton (Criminal Evidence, v. 3, p. 2122, § 1259, 11th ed.) says the right to have an adverse witness sworn may be waived. Prof. Wharton cites the Keeney case [7] (Okla.) which, in turn, is supported by the authorities to which attention is called. Cases from other jurisdictions are to the same effect.

We do not decide whether the oath was, or was not, waived in the instant case. Our decision rests upon the

[7] *Keeney* v. *State*, 53 Okla. Cr. Rep. 1, 6 Pac. 2d 833; *Moore* v. *State*, 96 Tenn. 209, 33 S. W. 1046; *Rhodes* v. *State*, 122 Ga. 568, 50 S. W. 361; *Barnes* v. *State*, 61 Tex. Cr. R. 37, 133 S. W. 887; *Smith* v. *State*, 81 Ga. 479, 8 S. E. 187; *State* v. *Hope*, 100 Mo. 347, 13 S. W. 490, 8 L. R. A. 608.

principle that no prescribed form is essential if the witness, either expressly or impliedly, having had her attention called to a Supreme Being who rewards or punishes in a manner she thinks she understands, assents to the proposition that the testimony given will not be false. Are we to resort to literal construction and say that because an eight-year-old girl who in other respects gave evidence reflecting average intelligence shall not be allowed to tell what she heard and describe what she saw when appellant remonstrated with her mother and made deadly use of a pistol—shall this inhibition be applied because the witness did not know what man-made law, as distinguished from the higher law, would do to her if she testified falsely?

The distinction is one of *definition,* rather than understanding. It is the exceptional person who, when called to testify, *knows* what punishment will result from perjury; nor is Pauline to be held incompetent because she did not know what the Circuit Clerk meant when he asked her if, she agreed "to tell the truth, the whole truth, and nothing but the truth." That she did not hold up a hand when "they called the names of all those folks back in the courtroom" is not of controlling importance. She *was* interrogated by the Judge, who impressed upon her full solemnity of the situation in so far as her degree of maturity permitted.

In the light of the Court's correct conception of what was necessary as a condition to qualification, Pauline, (but not without hesitation, retractions, and corrections in consequence of permissive guidance) in effect, said to the Court that God would punish her if she told an untruth, that it would be wrong to lie, and asserted that she would not do so. This was as effectual an oath as though the stereotyped incantation so familiar to court attendants had been pointedly directed to her at a time when she stood with uplifted hand.

An oath has been defined as a call upon God to witness that what is said by the person sworn is true, "and invoking the divine vengeance upon his head if

what he says is false.'' In *Brock* v. *Milligan,* 10 Ohio 121, where comment upon the quoted definition was made, it is said that ''if the witness states he considers the oath binding on his conscience, it is perfectly unnecessary and irrelevant to ask any further questions.'' But, it may be argued, the point in the present controversy is that Pauline testified she had not been sworn; hence, no definition dealing with the obligation of an oath can apply. That is true if it be held that particular words must be employed, and that language fairly susceptible of being construed as an acceptation of the Court's authority, coupled with an understanding of the moral aspect, be treated as of less dignity than the familiar intonation of an administering officer whose principal purpose is to see that a record is ''regular.''

*Second—Instructions.*—Insistence is that Instruction No. 15 is erroneous (a) because not applicable to facts; (b) it makes the opinion of the jury the test whether shots other than the first were necessary to the defendant's defense, ''rather than the defendant's honest belief as to this necessity''; and (c) it required a verdict of first degree murder, ''even though the defendant's actions in firing the subsequent shots were done under the stress of fear.''

Instruction No. 15 is copied in the footnote.[8] We think it is justified by the facts. Appellant's plea was self-defense. He contended that his wife ''got a death hold'' and while he backed away in an effort to disengage himself, Junie cut at him, and would not release her grip. Effect of the instruction is that if the defendant, without fault or carelessness, believed that in the circumstances he was in danger of bodily injury, he had

---

[8] ''Although you should find that the defendant fired the first shot or shots in his necessary self-defense, still if you should find from the evidence beyond a reasonable doubt that the defendant fired subsequent shots at a time when it was not necessary for the defendant further to defend himself as viewed from the standpoint of the defendant at the time, acting as a reasonable man, without fault or carelessness on his part, then you will find the defendant guilty of murder in the first degree, or murder in the second degree, or manslaughter; provided, you further find from the evidence beyond a reasonable doubt that such subsequent shots contributed to the death of the deceased.''

a right to fire the first shot, but was not privileged to keep on shooting if the first shot removed the danger. Whether that danger continued was a matter for the defendant himself to determine, "acting as a reasonable man, without fault or carelessness." The instruction is not to be construed as appellant contends.

Instruction No. 8 is copied below.[9] Worded somewhat differently, it was offered by the defendant. Modification in three respects is complained of. In the original, following the statement that "Walker Hudson has admitted killing Junie Pheiffer," there was the sentence: "This, however, is not sufficient to justify you in convicting him of any crime." Counsel for appellant urge that he was entitled to have the jury told that the mere act of killing, when admitted, is not punishable. What the instruction told the jury was that if Hudson honestly believed, without carelessness or fault on his part, that he was in danger of being cut or seriously injured, and believed it was necessary for him to shoot in order to prevent the injury, "then he is not guilty of any crime, and you should acquit him." The matter eliminated was submitted in substantially the same form. There was no prejudice.

The instruction, as offered, contained the language: "If Hudson shot the deceased [because] of a feeling of

[9] "Walker Hudson has admitted killing Junie Pheiffer. In this case, there are four possibilities: (1) Murder in the first degree, (2) murder in the second degree, (3) voluntary manslaughter, and (4) justifiable homicide, commonly called self-defense. If Hudson, after premeditation and deliberation, maliciously shot Junie Pheiffer, intending thereby to kill her, then he is guilty of murder in the first degree, but if he acted without deliberation or premeditation, then he is not guilty of murder in the first degree. If Hudson maliciously shot the deceased, but the shooting was done without deliberation, then he is guilty of murder in the second degree. But if the shooting was not done with malice, then he is not guilty of murder in the second degree. If the shooting was done without malice, but in a sudden irresistible heat of passion, caused by a provocation apparently sufficient to make the passion irresistible, then the defendant is guilty of manslaughter. If, however, Hudson shot the deceased because he honestly believed that he was in danger of being cut or seriously injured and believed that it was necessary for him to shoot in order to prevent this injury to himself, and if he reached this conclusion or belief from the facts as they appeared to him to be (without carelessness or fault, on his part), then he is not guilty of any crime, and you should acquit him."

malice or ill will which he had against her at the time of the shooting, but the shooting was done without deliberation or without the specific intent to kill her, then he is guilty of murder in the second degree.'' The words, ''without the specific intent to kill her,'' were eliminated. Intent may be implied from the act and circumstances surrounding a homicide. The instruction, as given, told the jury that if the defendant, with premeditation and deliberation, shot with the intent to kill, he would be guilty of murder in the first degree, ''but if he acted without deliberation or premeditation, then he is not guilty of murder in the first degree.'' ''Intent'' appears in the affirmative part of the charge, but is merely implied from the negative language. No prejudice resulted from the modification.

A request was that the jury be told that ''If the shooting was done without malice or ill feeling, but in a sudden irresistible heat of passion, due either to surprise, fear, terror, or anger (and not in self-defense), then the defendant is guilty of manslaughter.'' As given, the instruction read: ''If the shooting was done without malice, but in a sudden irresistible heat of passion, caused by a provocation apparently sufficient to make the passion irresistible, then the defendant is guilty of manslaughter.''

''Apparently'' was not explained. Since the passion, if irresistible, was not a matter the defendant could measure, purpose of the instruction must have been to inform the jury that it should determine whether defendant's passion affected him to such an extent that he was helpless to control himself. We do not think the criticism is well taken. Only general objections were interposed.

*Third—Sufficiency of the Evidence.*—Mrs. C. C. Cox testified that when appellant came to her husband's store the day of the killing he had a pistol. Cox testified that he saw appellant standing in the woods near the store. Although appellant claims Junie was trying to cut him, there was no substantiation of this contention.

It was not shown that she had a weapon of any kind. According to Mrs. Cox, when Junie came to the store the day of her death, she was visibly frightened. Either of four of the shots was thought to have been fatal—virtually instantaneously so. Pauline testified that there was no demonstration by her mother, no attack. Other circumstances pointed to a planned assault.

Considering the testimony as a whole, it was sufficient to support the jury's verdict of murder in the first degree, upon which the judgment of electrocution was based.

Affirmed.

. ROBINS, J., (dissenting). I respectfully dissent from the majority opinion in this case. In my opinion, the lower court erred in permitting Pauline Pheiffer to testify. This little negro girl was said by one witness to be eight years old. According to other witnesses, she was younger. Granting that the trial court did not abuse its discretion in finding that she had sufficient intelligence and understanding to be a competent witness, the record, as I see it, conclusively shows that she did not appreciate the meaning of an oath, and that she did not realize that she had been sworn to tell the truth. While she stated that she knew that it was wrong to tell "a story" and that the "bad man" would "get" her if she told something that was not true, she said that she did not know what swearing was, that she did not know what an oath was, that she did not hold up her hand with the other witnesses, and that when the clerk administered the oath she did not know what he was asking of the witnesses.

. Now it is essential that a witness should not only know what telling the truth means, but should also knowingly assume an obligation to tell the truth. No matter how mature or intelligent a witness may be, his testimony should not be received unless he has made some formal promise by oath or affirmation that he will tell the truth in the case. In Greenleaf on Evidence, 15th Ed., vol. 1, pp. 448-449, the rule is thus expressed: "But here

it is proper to observe, that one of the main provisions of the law, for securing the purity and truth of oral evidence, is, that it be delivered under the *sanction of an oath.* . . . A security to this extent, for the truth of testimony, is all that the law seems to have deemed necessary; and with less security than this, it is believed that the purposes of justice cannot be accomplished.''

It is possible that, if the meaning of an oath had been explained to this witness, she might have acquired an understanding thereof which a subsequent examination would have disclosed, and the oath could then have been administered to her so as to make her testimony given thereafter competent. ''If the child, being a principal witness, appears not yet sufficiently instructed in the nature of an oath, the court will, in its discretion, put off the trial, that this may be done.'' Greenleaf on Evidence, 15th, vol. 1, p. 505.

What was said by Judge Hart in the case of *Crosby* v. *State,* 93 Ark. 156, 124 S. W. 781, 137 Am. St. Rep. 80, is applicable here: ''In the present case we do not think the examination of the witness by the circuit judge was sufficiently comprehensive. The child must not only have intelligence enough to understand what he is called upon to testify about and the capacity to tell what he knows, but he must also have a due sense of the obligation of an oath, by which is meant . . . that the promise to tell the truth must be made under 'an immediate sense of the witness' responsibility to God, and with a conscientious sense of the wickedness of falsehood.' ''

In the face of the witness' unequivocal statement that she was not sworn, that she did not understand the nature of an oath, and that she did not know she had promised to tell the truth, I cannot agree that her testimony was properly admitted. In a trial where the issue is life or death of a human being no solemnity, commanded by law to be observed, ought to be omitted.