WILLIAM EARL FIELDS *v.* STATE OF ARKANSAS

CR 73-89                                        502 S.W. 2d 480

Opinion delivered November 26, 1973
[Rehearing denied January 14, 1974.]

*Oscar Fendler,* for appellant.

*Jim Guy Tucker,* Atty. Gen., by: *Phillip M. Wilson,* Asst. Atty. Gen., for appellee.

CARLETON HARRIS, Chief Justice. William Earl Fields, appellant herein, age 25, stationed at the Air Base in Blytheville, was charged on three separate instances of knowingly and intentionally exposing his private parts to several minor children under the age of 16 years, and on trial was found guilty by a jury on all three charges, receiving a sentence of six months on one, one year on another, and one and one-half years on the third. The trial court directed that these sentences run consecutively and judgment was so entered. From that judgment, appellant

brings this appeal. For reversal, eleven points are asserted, which we proceed to discuss in the order listed.

## I.

The trial court erred so many times that it was impossible for defendant-appellant Fields to obtain a fair and impartial trial.

## II.

The trial court erred when it ruled that the case be tried in Division 2 of the Second Judicial District when it should have been tried in Division 1.

## III.

The trial court erred when it limited defendant-appellant Fields and his counsel in the time in which he could file additional pleadings.

## IV.

The trial court erred when it denied defendant-appellant Fields' Motion to Quash Venire or Jury Panel.

## V.

The trial court erred when it failed to disqualify itself after testimony of defendant-appellant Fields and of his father.

## VI.

The trial court erred when it failed to prohibit the testimony of a minor who had no understanding of the obligation of an oath.

## VII.

The trial court erred when it failed to prohibit the testimony relating to prior alleged similar acts of defendant Fields in March 1972.

## VIII.

The trial court erred when it allowed to remain in evidence State's Exhibit 1, the football jersey, because it was obtained under a faulty search warrant.

## IX.

The trial court erred when it denied defendant's offered Instruction No. 3.

## X.

The trial court erred when it denied the defendant's offers of evidence because this proffered evidence did relate to degree of punishment the jury might assess against Fields if it found him guilty.

## XI.

The trial court erred when it allowed the State to discuss in the presence of the jury the refusal of defendant to sign printed form concerning his constitutional rights.

## I.

This point is what is known as a "scatter-load", based on the other alleged errors, and need not be discussed separately.

## II.

Appellant asserts that error was committed because his case was tried in Division 2 of the Second Judicial District when it should have been tried in Division 1. In support of this allegation, appellant relies upon Ark. Stat. Ann. § 22-322.12 (Supp. 1971).[1] This contention was

---

[1]"The Circuit Court Clerks of each of the courts in the several counties shall keep and maintain two (2) separate dockets, one (1) for criminal cases and one (1) for civil cases, and each case filed shall be entered in the proper docket. The Judge of the First Division shall preside over cases assigned to the Criminal Docket and the Judge of the Second and Third Divisions shall preside

first made before the court on the day before trial when a motion was filed to release appellant on bond, the objection to the trial during the civil term was made, and a continuance was requested until April 2, 1973, when the First Division Court would be trying criminal cases. It is argued that the record does not reflect that Judge Harrison, in Division 2, entered an order assigning these cases on the criminal docket of Division 1 to his division for trial. This contention refers to Ark. Stat. Ann. § 22-322.3 (Repl. 1962) which requires a written order by the court before the clerk could assign cases. That provision, however, was superseded[2] by § 22-322.12 which requires an "appropriate" order for the reassignment of a case from one docket to another. The standard for the assignment is that the arrangement is found to be best for the dispatch of business. When the pretrial hearing was held on January 2, no complaint was raised about the dates set for trial, nor was there any complaint about the court that would try the case. Therefore, it would not appear that there was any prejudice because of the clerical methods employed by the court in making the transfer; nor does there appear to be any abuse of discretion on the part of the court, for the record discloses that Division 1 conducted the preliminary handling of the case at a time when Judge Harrison was the presiding judge of the Criminal Division, and was thus actually in a better position to continue with the disposition of the case.[3] We pointed out in *Gardner v. State,* 252 Ark. 828, 481 S.W. 2d 342, that one of the main purposes of Act 505 of 1965 (creating the several divisions, designating one as "Criminal" and the other two as "Civil") was to permit the transfer of civil or criminal cases in order that litigation

over cases assigned to the Civil Docket. During each term of either division of the Circuit Court, the presiding Judge, by appropriate orders, may assign the first instance, or reassign, any case, Criminal or Civil, from one docket to the other as may be found best for the dispatch of business. The Judges of the three (3) Divisions will alternate in the holding of courts in the three (3) divisions so that each judge will hold approximately one-third (1/3) of the first division (criminal) terms in each county of the district, and two-thirds (2/3) of the second and third division (civil) terms in each, county of the district."

[2]The compiler also comments, "This section is deemed to be superseded by § 22-322.12 effective January 1, 1967."

[3]Judge Harrison had conducted the hearing when appellant was sent to the State Hospital for observation.

would be disposed of more expeditiously.[4] We fail to see how appellant suffered prejudice because of the transfer, and it might also be mentioned that Ark. Stat. Ann. § 22-322.7 (Repl. 1962) provides that it "shall not be reversible error that any case is tried in the division to which it has not been especially assigned***." Also, see *Blackstead Mercantile Co.* v. *Bond,* 104 Ark. 45, 148 S.W. 262.[5]

## III.

Two of these charges were filed in the month of July, 1972, and the third was filed in September of that year. A pretrial conference was set for, and held, on January 2, 1973, at which time the case was set for trial for January 16, 1973. Although the length of time mentioned was more than adequate for the filing of motions, and although a pretrial conference was held on January 2, it was not until January 15, one day before the time set for trial, that counsel for appellant announced that he had other pleadings to file. The court told counsel that he would not entertain any pleadings the next morning,[6] and gave counsel until 11:00 A.M. to file whatever he desired to file, the time period amounting to about an hour. It is vigorously argued that this limitation was unreasonable, and requires a reversal.

---

[4]Appellant says that his consent was necessary for he was not seeking a speedy trial. We do not agree. In *Standards Relating to a Speedy Trial* promulgated by the American Bar Association Project on Minimum Standards for Criminal Justice, Section 1.1 [Approved Draft, 1968], it is pointed out that the principles set out in the report deal primarily with the protection of the defendant, but that the public too is interested in a speedy trial. "From the point of view of the public, a speedy trial is necessary to preserve the means of proving the charge, to maximize the deterrent effect of prosecution and conviction, and to avoid, in some cases, an extended period of pretrial freedom by the defendant during which time he may flee, commit other crimes, or intimidate witnesses."

[5]This case came from the same Chickasawba District where two divisions were then in existence.

[6]From the record:

"This Court is not going to entertain any pleadings in the morning, Mr. Fendler. If you have any, you have to get them in and get them filed before noon today. You have had since July '72 to file your pleadings, and to get ready for trial. You announced ready for trial on the 2nd of January. You then told the Court you wanted to plead the defendant guilty because he was guilty. You then had a conference and came back and told the Court that you didn't want to plead him guilty, and then I was informed again Friday

Of course, under some circumstances, the period of time allotted would quickly be considered unreasonable, but as previously pointed out, adequate time had already been afforded for the filing of any pleadings. Within the hour, counsel returned and filed a Motion to Quash the Jury Panel. In oral argument, counsel candidly admitted that at the time he said that he would file more pleadings, he had no particular pleading in mind, but simply intended to study the matter further and determine what pleadings he did care to file. He seemed rather surprised that he was not permitted to file additional pleadings up until the time the trial started; however, we can take judicial notice that many trial courts, as a matter of precluding continuances after witnesses have been notified to appear, and as a matter of preventing disruption of the orderly process, have rules limiting the time that additional motions may be filed before the date of trial. This is not a matter relating to a sudden occurrence of some unexpected event that made necessary the filing of an additional motion. We find no merit in this contention.

## IV.

This was the motion that was filed the day before the trial and it asserts that the "Jury Panel or Venire does not have any colored persons on it.[7] It is a well-known fact that between 25% to 30% of the registered voters of the Chickasawba District of Mississippi County, Arkansas, are colored. This failure to have colored persons on the venire is in violation of the constitutional rights of this defendant."

In the first place, let it be pointed out that the United States Supreme Court has never said that the failure to have members of the black race on a particular panel,

or Saturday that you had informed the prosecuting attorney again that he was guilty and you were going to plead him guilty this morning, and then this morning you appear with this motion, and say he is not guilty, and you want a trial, so the matter will be for trial in the morning."

[7] In *Peters* v. *Kiff*, 407 U.S. 493, 33 L. Ed. 2d 83, the Supreme Court pointed out that the right to seek relief because of discrimination against members of a particular race in the selection of juries is not limited to a criminal defendant of that particular race, but may be exercised by a defendant of any race where jury members of any other race have been arbitrarily excluded.

is discriminatory; rather their holdings have been based on systematic exclusion of members of that race from the jury panel.

In *Apodaca* v. *Oregon,* 406 U.S. 404, 32 L. Ed. 2d 184, the court rejected an argument that every distinct voice in the community has a right to be represented on every jury, stating:

"All that the Constitution forbids, however, is systematic exclusion of identifiable segments of the community from jury panels and from the juries ultimately drawn from those panels; a defendant may not, for example, challenge the makeup of a jury merely because no members of his race are on the jury, but must prove that his race has been systematically excluded. [Citing cases]."

In *Swain* v. *Alabama,* 380 U.S. 202, 13 L. Ed. 2d 759, the court said:

"Although a Negro defendant is not entitled to a jury containing members of his race, a State's purposeful or deliberate denial to Negroes on account of race of participation as jurors in the administration of justice violates the Equal Protection Clause."

In the case now before us, there is no evidence of systematic discrimination and remarks of counsel clearly indicate that his contention is that there were no black persons on the panel *at the time of this trial.* Counsel offered the testimony of the Deputy Circuit Court Clerk to the effect that there was only one Negro on the panel for the term of court beginning the first of January, 1973, and that person had been excused for the term. However, the deputy clerk testified that members of the Negro race had served as jurors in 1972 and, to her knowledge, for at least six to eight prior years. In *Peters* v. *Kiff,* *supra,* the Supreme Court held that since discrimination in jury selection will not be presumed, a defendant carries the burden of proving such discrimination, but once a *prima facie* case, or strong inference of race discrimination in jury selection has been presented, the burden shifts

to the state to overcome the presumption. Appellant offered only the evidence mentioned; he was not refused the right to offer additional testimony, and the evidence offered certainly was not sufficient to establish a *prima facie* case, or raise a presumption of discrimination.

## V.

Appellant and his father testified in chambers that they believed Judge Harrison was biased and should disqualify himself in the case. Appellant, in reply to a question from his counsel, stated that he was present when the judge "turned down your motion for continuance, he stated that—when he turned down your motion to lower the bond to $5,000—he said 'You were out on bond before and you committed two other criminal acts *** to me that in his eyes I am already guilty.' "

Appellant's father testified:

"On two occasions when I talked to the Judge in front of you [Mr. Fendler] and Mr. Partlow and the two clerks, I asked if anything could be done at all that would get him medical treatment rather than be put in the pen, and he stated that when he was in the pen, he could get medical help. On two occasions he made this statement, and the statement he made this morning, so far as he was concerned, my son is already guilty."

Let it first be pointed out that, according to the record, on October 9, 1972, formal arraignment was waived and a plea of not guilty by reason of insanity had been entered; likewise, a motion had been made to commit appellant to the State Hospital for thirty days observation and examination, which had been granted, and Judge Harrison had signed the order of commitment. In addition, at the pretrial hearing on January 2, counsel for appellant had acquainted the court with his efforts to get appellant into a mental hospital, stating that his client needed psychiatric treatment, having a nervous disorder related to sex. So—the remark of the court certainly did not indicate any prejudice. Be that as it may, it must be remembered that all remarks herein mentioned were

made prior to the commencement of the trial, and outside the hearing of any members of the jury panel. In *Walker v. State*, 241 Ark. 300, 408 S.W. 2d 905, the trial court made remarks considerably stronger than those in the present instance, but we held no showing of disqualifying prejudice had been shown, pointing out that the fact that a trial judge may have a personal opinion as to the merits of the case does not make the trial court so biased and prejudiced as to require his disqualification, and commenting that the "mischief occurs when the trial court communicates to the jury by word or deed a personal bias, prejudice or animus toward the accused, causing the accused to be denied a fair and impartial trial." It is mentioned that statements by a trial court, in no way communicated to the trial jury, could not constitute bias or prejudice requiring disqualification.[8] We find no merit in this contention.

## VI.

Wayne Porter, a ten-year-old boy, testified as to the charge occurring on July 21, being in the company of Donna Pipkin, age 15, Lisa Bigham, age 8, and Vickie Carner, age 14. When asked if he understood that he was under oath, the boy replied, "I didn't know that until you just now told me." He stated that he realized that he was supposed to tell the truth but when first asked if he knew what would happen if he didn't tell the truth, he replied, "Well, not really." He said that he knew that it would be bad if he didn't tell the truth and stated in reply to what would happen if an untruth were told, "I imagine I would get punished for it." At the suggestion of counsel for appellant through a leading question, Wayne testified that he meant he would get a spanking from his Mother and Dad. He stated that he did not attend Sunday School and Church. Over objections, the court permitted Wayne to testify. The next morning, in chambers, before the trial resumed, the court asked counsel for appellant if he desired to renew his motion as to this witness and

[8]The United States District Court for the Eastern District of Arkansas, Pine Bluff Division, concurred in this view, stating:

"But, as pointed out by the Supreme Court, latent, subjective prejudice of that sort is not enough to require a judge to disqualify himself in a jury case." See *Walker v. Bishop*, 295 F. Supp. 767, 773.

upon being told that counsel still desired to so move, the record reveals the following:

> "The Court is going to strike the testimony of the witness, Wayne Porter, giving to this defendant something which the Court really doesn't feel he is entitled to, but in order to ensure to the defendant an absolutely and completely fair trial in every respect, and so that no question can be raised whatsoever about the competency of any testimony, and in view of the fact that this request has been made, it will be honored and the jury will be admonished to disregard it.

> "MR. FENDLER: At this time on behalf of the defendant, Judge Harrison, I am moving the Court to declare a mistrial on these cases because the testimony was given over my objection as defense counsel. My motion at that time should have been granted and at this time is prejudicial to my case and will cause a very bad effect on the jury. I am making a motion for mistrial at this time. In the alternative, if you don't grant my motion for mistrial, then I would request the strongest admonition to the jury; you will very strongly tell them to get it out of your mind once you have heard it, but since Mr. Fendler asked it be denied yesterday and the motion was overruled; and no reference to be made to it in the arguments.

> "COURT: In view of the rulings of the Court, you were not entitled to it initially. Of course, the Court is of the same feeling you are not entitled to it now, but the Court, as I stated, in order to give to you and this defendant every avenue that might be available to present for the defendant in an effort to see and ensure an absolutely fair trial, this is the only reason the Court brings this up at this time, and if this is the attitude of the defendant, and he doesn't care to have this granted except and on condition a mistrial be granted, that will be denied, and we will continue with the trial.

> "MR. FENDLER: Note my exceptions.

"COURT: The ruling will remain as initially made."

Taking the matter from the outset, the actual point for reversal is that Wayne "had no understanding of the obligation of an oath", and appellant principally relies upon the cases of *Crosby* v. *State,* 93 Ark. 156, 124 S.W. 781, and *Hudson* v. *State,* 207 Ark. 18, 179 S.W. 2d 165. In the first, this court held, that in understanding the nature of an oath, the child must be under the immediate sense of his responsibility to God with a conscientious sense of the wickedness of falsehood. In the last cited opinion, Hudson was convicted of murdering his wife. The daughter of the deceased, an eight-year-old girl named Pauline, testified and it was contended that this little girl was not competent to testify. The opinion reveals the following facts:

"Counsel for appellant cross-examined Pauline in respect of qualification and asked : 'Did you hold up your hand today when they called the names of all those folks back in the courtroom?' (2) 'Do you know what an oath is?' (3) 'When (the Circuit Clerk) asked you if you agreed to tell the truth, the whole truth, and nothing but the truth, did you know what he was asking?' To each question a negative answer was given. The little girl asserted that she knew the difference between right and wrong, but did not know what happened to one who did wrong; but she knew about God, and if she did wrong she knew He would do something about it. She later said: 'He will kill you.' She knew what the truth was, but when asked to define it replied, 'I don't know.' " [9]

---

[9] "(5) Amplifying this line of examination, the following questions were asked and answers given: 'Q. What do you mean by that? A. Tell the truth. Q. Tell the truth? A. Yes, sir. Q. And if you *didn't* tell the truth, what would happen to you? If you are *not* telling *me* the truth about what I am asking you, what is going to happen to you? A. I don't know . . . Q. As far as you know, there wouldn't anything happen to you if you didn't tell (those men over there) the truth. Is that right? A. Yes, sir.'

(6) Question: 'Pauline, you say you know the difference between right and wrong? A. Yes, sir. Q. You have been taught that at home, and in Sunday School? A. Yes, sir. Q. Is it right or wrong to tell a story? A. It's right. Q. It is right? A. It's wrong. Q. What happens to you if you tell a story? A. The bad man will get you. Q. Where did you learn that? A. Nowhere. Q. Now, do you know what swearing is? A. No, sir. Q. Would you swear something is

The court then held her testimony admissible "having had her attention called to a Supreme Being who rewards or punishes in a manner she thinks she understands [and] assents to the proposition that the testimony given will not be false." We then commented:

> "The distinction is one of *definition,* rather than understanding. It is the exceptional person who, when called to testify, *knows* what punishment will result from perjury; nor is Pauline to be held incompetent because she did not know what the Circuit Clerk meant when he asked her if she agreed 'to tell the truth, the whole truth, and nothing but the truth.' That she did not hold up a hand when 'they called the names of all those folks back in the courtroom' is not of controlling importance. She *was* interrogated by the Judge, who impressed upon her full solemnity of the situation in so far as her degree of maturity permitted."

Over the years, these holdings have been somewhat modified and the *Crosby* case is mentioned in our last case on this subject, *Allen* v. *State,* 253 Ark. 732, 488 S.W. 2d 712. There, Allen was charged with the rape of an eight-year-old girl, convicted, and sentenced to life imprisonment. On appeal, *inter alia,* appellant contended that the trial court abused its discretion in permitting this little girl to testify. On this point, this court said:

> "As to the requirement of understanding the nature and effect of the oath, we said in *Crosby* v. *State,* 93 Ark. 156, 124 S.W. 781, that the child must be under an immediate sense of his responsibility to God with a conscientious sense of the wickedness of falsehood. But this court has found no abuse of discretion in the trial court's determination of competency where the child realizes that he is obliged to tell the truth and that he will be punished for not doing so, i.e., that he will be punished for not telling the truth because telling falsehoods results in punishment. In

---

so that is not so? A. No, sir. Q. If you were to sit here today in that chair and tell these people a story, or something . . . that wasn't true, what would happen to you? A. The bad man would get me. Q. Would that be right, or wrong, for you to do that? A. It would be wrong.' "

*Crosby,* the witness did not know what the conse-
quences of his failure to testify truthfully would be
and was not asked anything from which it could be
inferred that he had a sufficient sense of the danger
and wickedness of false swearing or that he com-
prehended and appreciated the sanctity and obliga-
tion of an oath. In *DeVoe* v. *State,* 193 Ark. 3, 97
S.W. 2d 75, we had this to say regarding an eight-
year-old prosecutrix in a rape case:

> 'As to her competency, it may be said, first, that
> her competency was peculiarly within the trial
> court's discretion, and the trial court's ruling on
> the question will not be disturbed unless there was
> a gross abuse of discretion ***. The witness in the
> present case was eight years old, appeared to be in-
> telligent, to understand what was meant by an oath,
> and she testified intelligently. We are of the opin-
> ion that the trial court did not abuse its discretion
> in permitting the witness to testify.'

"We cannot say that there was an abuse of the
judge's discretion in this case. Our view in this
regard is bolstered by the apparent intelligence of
the witness disclosed by her testimony and the re-
sponsiveness of her answers to the questions pro-
pounded to her."

Actually, in *Allen* the record does not reveal that
anything at all was said about an oath, and in qualifying
the witness, *no questions* were asked relative to whether
the prosecuting witness understood the obligation of an
oath. In the case presently before us, Wayne did testify
that he realized that he should tell the truth and that he
would likely be punished for not doing so, and he also
stated that the taking of the oath had been explained to
him. No such evidence as this last appears in *Allen.* Fur-
ther, questioning indicated normal intelligence for one
that age. He mentioned his friends, how far away they
lived from his home, what the children were doing at the
time of the occurrence testified about, and he gave a clear
description of what the party who exposed himself was
doing when he observed him. His identification of appel-

lant was weak, and it appeared that he was reluctant to disagree with counsel on cross-examination. Yet, a reading of the record very definitely leaves the impression that the little boy was endeavoring to tell the truth.

Apparently, the court subsequently, as a matter of avoiding any possible error, made the offer heretofore set out to strike the testimony. As shown by the record, counsel for appellant moved for a mistrial, with an alternative request, that if this be denied, that the "strongest admonition" be given to the jury. It would appear that the court did not hear the alternative for the judge then said that if counsel did not care to have the motion to strike granted "except and on condition a mis-trial be granted, that will be denied and we will continue with the trial." Counsel did not further pursue the matter other than to say "Note my exceptions", and did not call to the attention of the court that he had made an alternate request, and it certainly appears, if he were insistent on the alternative that this would have been done. At any rate, the court consistently stated that it considered the little boy competent, and we are of the view that, certainly under our most recent case, no abuse of discretion was shown.

It might be well to also point out that nine other children testified to the acts committed by appellant; that three others, including a fourteen and fifteen-year-old girl, testified to this particular act, and the testimony was only cumulative. Without any hesitation, under the circumstances herein, we would say that, if error was committed, it could not have been prejudicial. In other words, in viewing all of the testimony herein and considering its overwhelming nature, we think unquestionably that the removal of Wayne's testimony from the case would not have affected the jury verdict.

## VII.

This alleged error refers to the testimony of Sandra Mitchell, 13 years of age, and Teresa Shoemaker,[10] 13

[10]Sandra was one of those to whom Fields allegedly exposed himself on July 17 and Teresa was also present on that occasion but did not view the act, Teresa, upon observing the car, hollering "Run".

years of age, both of these little girls testifying that Fields deliberately exposed himself to them in March, 1972. This was not one of the offenses charged, but was offered by the state as a matter of showing the intent of appellant. The statute itself, Ark. Stat. Ann. § 41-1127 (Repl. 1964), reads:

> "It shall be unlawful for any person with lascivious intent to knowingly and intentionally expose his or her private parts or genital organs to any other person, male or female, under the age of sixteen (16) years."

It is thus apparent that intent is an integral part of the offense, and the evidence mentioned was offered for this purpose. These two children testified to practically the same acts on the part of appellant as had been allegedly committed before the other children, and we think the evidence was admissible. In *Ward* v. *State*, 236 Ark. 878, 370 S.W. 2d 425, appellant was charged with fondling a male child under the age of 14 years in violation of § 41-1128. There, evidence of a similar offense committed several years before was offered by the state, and on appeal, was approved by this court. We pointed out that a different rule, as to evidence reflecting intent, applies to unnatural sex cases and quoted from an earlier case. See *Alford* v. *State*, 223 Ark. 330, 266 S.W. 2d 804, and cases cited therein. The alleged offense, here offered in testimony, had only occurred a few months before the instances of similar conduct with which appellant was charged, and we think unquestionably, under our cases, that this was competent testimony. The court's instruction 16 told the jury that evidence of the similar offense was admitted solely for the purpose of showing appellant's intent, motive, habits, and practices, and could only be considered for that purpose.

## VIII.

Sandra Mitchell, Teresa Shoemaker and Sherry Richardson all stated that the person who exposed himself was wearing a maroon and white football jersey; the first two said that it bore the number 67, and the last men-

tioned that it bore the number 78, though she said that she was not sure about the number.[11]

Officer Robbie Cox, Chief of Police at Blytheville, obtained a search warrant, the affidavit for the warrant stating that Cox had reason to believe that at Barracks 612, No. 3, Blytheville Air Force Base, there was concealed one maroon football jersey with the numerals 67 which Fields was wearing at the time of the alleged incident. The facts tending to establish the grounds for issuance were listed as statements from Teresa Shoemaker and Sandra Mitchell, who had been interviewed separately. Appellant objected to the exhibit, pointing out that the affidavit listed a maroon football jersey, and the officer came back with a white football jersey. The jersey, offered in evidence, is white with a maroon number 67 on both front and back. It was pointed out by the court that when this jersey was offered in evidence, no objection was offered until after the state had finished its examination and the witness had been taken on cross-examination. Aside from that, however, we find no merit in the contention of error. Cox testified that the description of the jersey as maroon, was either his error or that of a typist because he did receive the information from the little girls that the jersey was maroon and white, and with the numerals 67. Appellant cites the old case of *State* v. *Nejin*, 74 So. 103 (1917), where the Louisiana Superior Court said that "Where the purpose of the search is to find specific property, it should be so particularly described as to preclude the possibility of seizing any other." This same language is used in *Lea* v. *State*, 181 S.W. 2d 351 (1944) and *Cagle* v. *State*, 180 S.W. 2d 928 (1944). *Nejin*, however, also points out that the language "particularly describing the place to be searched and the persons or things to be seized" is to be reasonably interpreted and does not necessarily mean a minute and detailed description of the property to be seized. In the Tennessee case of *Poole* v. *State*, 467 S.W. 2d 826 (1971), the defendants insisted that the property for which a search had been made, was not adequately described with particularity, the description being "one electric heater, one orange colored ice jug,

---

[11]On another similar occasion, Vicki Carner obtained the license number of the automobile.

16 gauge shotgun, shells, 22 shells and so forth." In rejecting this contention, the Court of Criminal Appeals of Tennessee said:

> "We think, as did the trial judge, that these items were about as particularly described as such commodities can be. Such merchandise is difficult to describe. It may be said that the heater should be described as a 'G.E.' or a 'Westinghouse', it could also be argued there are thousands of G.E. heaters and thousands of Westinghouse heaters. Shotgun shells might be described as Remington, Western or Winchester or by name of the manufacturers, still it could be argued there are untold numbers of Winchester, Remington or 'Peters' shotgun shells 12's 16's and 20's."

A somewhat comparable situation existed in the Arkansas case of *Easley* v. *State*, 249 Ark. 405, 459 S.W. 2d 410. There it was contended that the description of the property to be searched was insufficient, the search warrant stating that the property sought was concealed in "the house occupied by Bud Easley in or near Hiwasse in the County of Benton." In rejecting the contention, this court said:

> "A search warrant is directed to the officer who is to make the search and Easley does not contend that the officers searched the wrong house under the warrant. Common sense dictates that the constitutional requirement that a search warrant contain a particular description of the property to be searched, is designed and intended to aid the officers in locating the right property to be searched, as well as to protect innocent property owners from unreasonable searches and seizures and prevent officers from searching the *wrong* property."

Here, the testimony reflects that the *information given* was correct, but that a mistake was made in the affidavit. After all, what was the most important part of the description relative to identifying the property? Unquestionably, it was the number 67. This was a *particular,*

*specific* description, and we think, in accord with the authority quoted, would have prevented the officers from taking the wrong property. Of course, by necessity, a football jersey bearing numerals, would have to be of two colors, in order that the numbers could be identified. We conclude that the contention is without merit.

## IX.

Appellant's Offered Instruction No. 3 was AMI Civil Instruction 102, which provides,

"In considering the evidence in this case you are not required to set aside your common knowledge but you have a right to consider all of the evidence in the light of your own experiences and observations in the affairs of life."[12]

In considering this point, it might be stated at the outset that we are puzzled as to the purpose in offering this instruction. What would be the experiences and observations of members of the jury as related to the evidence offered in this case? What would be the "common knowledge" referred to? At any rate, it certainly appears that the requested instruction is abstract and we cannot see where it is at all germane to the factual issues being tried. It is not error to refuse to give an abstract instruction. *Stevens* v. *State,* 246 Ark. 1200, 441 S.W. 2d 451. For that matter, the instruction, at most, could only have been cautionary, and we have held that the giving or refusing of a cautionary instruction lies within the sound discretion of the trial court. *Baxter* v. *State,* 227 Ark. 215, 298 S.W. 2d 47.

## X.

The evidence referred to under this point was competent, says appellant, because it related to the degree of punishment the jury might assess against Fields if it found him guilty. It will be recalled that Fields first entered a plea of not guilty by reason of insanity, but subsequently

[12]The word "of" does not follow "all" in AMI Instruction 102, and the requested instruction transposed the words "observations" and "experiences."

changed that plea to "not guilty". There is a great deal of difference in the proof that would be relevant under these two pleas. Of course, under the first plea, there is an admission of guilt of the act charged, but one contends that because of a defective mental condition and the inability to determine right from wrong, such defendant is not responsible for his act. Under this plea, evidence of a psychiatrist would, of course, be most pertinent, and evidence of irrational acts would be admissible, but the plea of "not guilty" simply means that a defendant is saying, "I didn't do it!" Appellant offered the evidence of Dr. Joe E. Hutchison, Psychiatrist at the Arkansas State Hospital in Little Rock, Dr. Hutchison being one of the staff who observed appellant during his thirty-day stay in the hospital for observation. The doctor explained the tests that are given, stated that the function of the staff was to determine "whether there is enough ego or personality disintegration which would disable the accused, make them irresponsible or mentally incompetent", and testified that Fields probably was not mentally ill to the degree of legal irresponsibility. Counsel then asked if the doctor thought Fields was amenable to therapy and the court suggested that further hearing be conducted out of the presence of the jury. In chambers, Dr. Hutchison said that, speaking personally, he felt that Fields would be one of the most favorable candidates for therapy. He described this therapy as "Psychotherapy. Group psychotherapy treatment, and also they call it behavorial modification, which specifically would be deconditioning. *** If he had the right type of therapy, in my personal opinion his prognosis would be good." The doctor said that Fields had a superior I.Q.; that is, between 130 and 140. Finally, counsel asked Dr. Hutchison if "in your observation as a psychiatrist for years, and particularly in the State Hospital, what do you think is going to happen to him if he is sent to the penitentiary or given any confinement?" The court, after objection, held this question, as well as the doctor's other testimony, to be incompetent because no defense of insanity had been interposed, and stated that further questions along that line would not be permitted. Counsel then made his offer of what the witness would state as follows:

"Judge, if he were allowed to answer, this witness would say that sending this man to the penitentiary would destroy him; that it would be the worst possible thing that could happen, having him confined. This man needs to be treated as an outpatient and not even as an inpatient in an institution, and that if he were treated as an outpatient, with the proper type of psychiatrists handling this that knew these problems, that very likely, most likely, there will be a complete recovery."

Counsel then referred to lay witnesses, persons who had known appellant for a number of years, stating that these persons would all testify that in their opinion, even a short stay in the penitentiary would "destroy" appellant. It was stipulated by the state that those particular people would give the answer stated.

The court acted properly in refusing appellant's request to present this evidence. The effect upon an individual of being sent to the penitentiary has nothing to do with one's guilt or innocence on the charge being tried. Unfortunately, it may well be that many young people who are sent to the penitentiary are not "helped", i.e., made better citizens by virtue of having been there. We daresay that this same contention could be raised by divers persons who have violated the law, but, in determining guilt or innocence, such testimony is entirely and completely irrelevant.

Of course, evidence of good reputation in the community is admissible, and the trial court not only permitted this type of evidence, but also permitted witnesses to mention specific acts of good conduct. For instance, Lt. George Bolton, III, located at the Blytheville Air Force Base and working in Personnel, testified that the records did not reflect any type of military disciplinary action taken against Fields during his service and the witness was permitted to read a portion of the last Airman Proficiency Report on Fields,[13] and also commented from

[13]From the report:
"Staff Sgt. Fields is a personable and conscientious individual. He strives for perfection in everything. He is dependable, self-confident, and is con-

the report that "Staff Sgt. Fields was selected as pride man of the month for June, 1972 in the A.G.E. Branch." The witness further read under "Educational and Training Accomplishments" from a report dated between December 3, 1970 and December 2, 1971, "Staff Sgt. Fields is an outstanding Airman. He has demonstrated his willingness to get ahead by having enrolled in off-base college courses during his off duty hours."

Col. William C. Brewer, Deputy Commander for Maintenance for the 97th Bomb Wing at the Air Force Base, testified in a similar vein.

Numerous other witnesses, some of whom had known appellant for many years, testified as to his generally good reputation, including his former Scoutmaster, a former District Executive of the Boy Scouts of America, and one of his school teachers. His father, Chief Switchman for Southwestern Bell Telephone Company in that area, testified in detail about the boy's civic activities, the numerous honors that he had been awarded, and various other similar favorable facts. A hearing was then conducted out of chambers as to evidence appellant desired to offer through the father that the latter had contacted a psychologist and psychiatrist in Memphis, and made arrangements for appellant to have psychiatric treatment. As previously stated, this last was inadmissible evidence. Appellant also offered testimony, which was rejected by the court, of the parents of one of the little girls, that they did not desire to prosecute, considering the defendant to be sick.

Appellant vigorously argues that testimony of the various people relating to the effect of sending appellant to the penitentiary was admissible, but we cannot agree. Of course, had appellant entered a plea of guilty, extraneous factors could have been presented as a matter of aiding the court in determining the proper sentence. A sentencing court is entitled to receive reports of a probation officer, and any other evidence that might be

tinually striving to improve his performance in his job knowledge. He has a deep sense of responsibility and is loyal to both his subordinates and superiors alike."

helpful in this respect, but, in determining guilt or inno-
cence, this evidence is not proper for a jury.[14]

## XI.

Officer Mike Richardson of the Blytheville Police
Department was asked, following the arrest of Fields, if the
latter was advised of his constitutional rights. The
witness answered in the affirmative and said that any
person arrested is given a form that explains those
rights.[15] He testified that Fields was given such a form
and then started to state what the form reflected when
counsel for appellant objected, saying, "Judge, I would
object to this, whatever the form is, to show he signed it,
would be the best evidence; not what this witness says."
Counsel then demanded that the signed form be shown.
The prosecuting attorney thereupon stated that the de-
fendant had refused to sign the form and counsel objected.
In chambers, it was contended that appellant had been
prejudiced by the statement made in the presence of the
jury that the form had not been signed. We do not agree.
No confession was given by appellant, nor was any evi-
dence offered that he had admitted any charge or cir-
cumstance; in fact, there was no testimony as to anything
that appellant might have said. It is difficult to say how
the failure to sign the rights form could have been pre-
judicial. The refusal to sign frequently occurs, and it
certainly is not any sort of admission of guilt; at most,
it could only be argued that failure to sign demonstrates
that one has not been told his rights before making a
statement—and since no statement was here involved,
there could have been no prejudice. In oral argument,

---

[14]As pointed out in the *American Bar Association Minimum Standards for
Criminal Justice as Relating to Sentencing Alternatives and Procedures*, Section
1.1 (b), p. 46:

"It is also clear that sentencing by the jury is inconsistent with the princi-
ple that the sentencing decision should be based upon complete informa-
tion about the defendant himself as well as his offense. *Much of the informa-
tion most helpful at the sentencing stage is properly inadmissible on the
question of guilt*, and to admit it only on the question of sentence is highly
prejudicial if the jury is to consider both questions at the same time. Separa-
tion of the questions, on the other hand, involves separate trials, a time
consuming and costly venture that presents little gain in compensation."
[Our emphasis].

[15]*Miranda v. Arizona*, 384 U.S. 436 (1966).

counsel stated that it would cause the jury to think that appellant was "non-cooperative" with the officers, but we fail to see the significance. It might be said that, in chambers, the prosecuting attorney mentioned that he thought the refusal to deny the charge was an admission against interest and that he intended to argue that to the jury. If the state had made such an argument to the jury, prejudicial error would have resulted, but this was not permitted and was not done. The incident did not constitute error. Of course, counsel brought the matter up himself in asking the officer to present a signed form. More than that, however, the court instructed the jury to disregard the questions relative to advising the defendant as "to his rights and the form that was presented to the defendant." Counsel expressed his appreciation to the court for this admonishment and the matter thus rested.

Appellant was diligently represented and it appears that every possible defense to the charge was presented on trial. In this opinion, we have discussed these contentions at length and found them to be without merit. The matter mentioned in Point X, and which is so fervently argued by counsel, is one that properly addresses itself to the Executive Branch of Government.

Finding no reversible error, the judgment is affirmed.

It is so ordered.

BYRD, J., dissents.

FOGLEMAN, J., not participating.